**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **In re:** | * | **Case No. 2:23-bk-53043** |
| **WELCOME GROUP 2, LLC,** *et al.,*[1] | * | **Chapter 11** |
| | * | **Judge Mina Nami Khorrami** |
| **Debtors.** | * | |
| | * | **Jointly Administered** |

---

**OBJECTION OF HILLIARD HOTELS, LLC TO HILTON FRANCHISE HOLDING**
**LLC'S MOTION FOR RELIEF FROM AUTOMATIC STAY (Doc. 166)**

---

Comes now Hilliard Hotels, LLC, by and through its undersigned counsel, and hereby objects to the Motion for Relief from Automatic Stay (the "Motion") (*Doc*. 166) filed by Hilton Franchise Holding, LLC ("Hilton" or "Movant"), and respectfully requests that the Court overrule and deny said Motion as Movant has failed to establish cause for the granting of the relief requested, as more fully set forth in the Memorandum below.

/s/ Ira H. Thomsen
Ira H. Thomsen (0023965)
Darlene E. Fierle (0081217)
Denis E. Blasius (0082617)
140 North Main Street, Suite A
Springboro, Ohio 45066
937-748-5001
937-404-6630 (Fax)
ithomsen@ihtlaw.com
dfierle@ihtlaw.com
dblasius@ihtlaw.com

*Thomsen Law Group, LLC*
*Case Attorney and Counsel for*
*Debtors/Debtors-in-Possession*

---

[1] The Debtors and the last four digits of their federal tax identification numbers are as follows: Welcome Group 2, LLC (6795), Hilliard Hotels, LLC (6063), and Dayton Hotels, LLC (1123). The Debtors' headquarters are located at 5955 E. Dublin Granville Road, New Albany, Ohio 45305.

**MEMORANDUM**

## I.      FACTUAL BACKGROUND:

The Court will recall that at the hearing on First Day Motions and the Motion to Excuse Turnover, there was a recognition that the Property Improvement Plan ("PIP") and retention of the Hilton "flag" was a critical element in these Chapter 11 proceedings. Accordingly, on October 4, 2023, counsel for the Debtor provided counsel for Hilton with a proposed PIP.  Based upon the concern of counsel for Hilton, on November 17, 2023 counsel for the Debtor provided counsel for Hilton with the "Sources and Uses of Funds" to *complete* the PIP.[2]  It was not until January 8, 2024, that counsel for Hilton advised counsel for the Debtor that Hilton would not accept the PIP completion schedule as proposed by the Debtor.  In mid-January, counsel for the Debtor supplied counsel for Hilton with a revised PIP completion schedule, which showed a PIP completion of Fourth Quarter/December 2024, which counsel followed up with a 'red-line' of the revised PIP.[3]  On February 28, 2024, Hilton filed the Motion.

## II.      SUMMARY OF RELIEF REQUESTED:

In the Motion, Hilton alleges that "cause" exists for termination of the automatic stay based upon: (1) the alleged default by Hilliard Hotels, LLC (hereinafter "Hilliard" or the "Debtor") on payment of its post-petition franchise fees, (2) the alleged inability of the Debtor to assume the Hilton Franchise Agreement, (3) the alleged "incurable default" with regard to the PIP; and (4) the denigration of the value of the Hilton "franchise", argued as lack of adequate

---

[2] The Statement of Abhijit (Andy) Vasani shows that the Debtor has already spent over 1.5 million dollars on the PIP and continues to make PIP improvements to this day.

[3] On January 10, 2024, the Debtor received confirmation from Hilton that the "exterior" scope of the PIP had been accepted and the interior scope was still "under review".  See Vasani.Statement.

protection. However, none of these enumerated grounds for granting relief from stay hold water.

First, as set forth in the Statement of Abhijit ("Andy") Vasani attached hereto as Exhibit "A" and incorporated by reference herein (the "Vasani Statement"), the Debtor is current on all post-petition franchise fees and is not in default for failure to make payments. To allege otherwise and attempt to collect pre-petition franchise fees is a violation of the automatic stay. This is addressed simply and directly by Mr. Vasani in his Statement and needs no further comment.

Regarding the ability of the Debtor to assume the Hilton Franchise Agreement, Movant cited cases that are not favored in the Sixth Circuit and have been called into question by more recent holdings. The Debtor asserts that it has the ability to assume the Hilton Franchise Agreement pursuant to the Bankruptcy Code as set forth in greater detail below.

As to the alleged "incurable default" – the completion of the PIP – Debtor asserts that any alleged default is in fact curable, and Debtor has a plan in place to complete the PIP in a relatively short period of time. It should also be noted that Movant alleged inaccurately that the Debtor proposed to complete the PIP by March of 2025.  The most recent PIP submitted to counsel for Hilton shows a completed PIP by December 2024.

Finally, allowing additional time for the Debtor to complete the PIP will not harm the Hilton brand, and Hilton is adequately protected based on the actions of the Debtor and its continued cooperation with Hilton. In fact, Hilton, and not the Debtor, initiated and secured a multi-year commitment for the Debtor from a major international company. Hilton clearly sees significant value in its Hampton Inn – Sidney franchise.

### III.   <u>LAW AND ARGUMENT</u>

Hilton has not established sufficient cause for relief from the automatic stay to be granted, and as such the Motion should be denied. Hilton requests relief from the automatic stay under 11 U.S.C. §362(d)(1) which states:

> "(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;"

Hilton has not demonstrated sufficient "cause" to warrant relief from stay in this matter, and the Motion should be denied. In *In Re: Evergreen Site Holdings, LLC,* 652 B.R. 286 (Bankr. S.D. Ohio, 2023), this Court clearly and succinctly set forth the requirements necessary for a creditor to obtain relief from stay for "cause". This Court recognized that "the Bankruptcy Code does not define what constitutes sufficient cause. 'Instead, a bankruptcy court must determine whether sufficient cause exists on a case-by-case basis.'" *Id.* at 292, citing *In re Chari,* 262 B.R. 734, 737 (Bankr. S.D.Ohio 2001). "The Court must weigh the potential harm to the creditor caused by the stay versus the potential prejudice to the debtor, if any, that would be caused by relief from the stay." *Id.* In addition, the Court noted that "[t]he term "cause" is a broad and flexible concept that permits the bankruptcy court to respond to the fact-sensitive issues before it." *Id.* citing *In re Indian River Estates,* 293 B.R. 429, 432 (Bankr. N.D. Ohio 2003).

1.  **Hilton has not established the existence of "cause" under 11 U.S.C.§362(d)(1) because the prejudice to Debtor outweighs the harm to Hilton**

Here, the prejudice to Debtor clearly outweighs the harm to Hilton. This is evident by the facts set forth in Hilton's own Motion. Hilton states that "Hilliard agreed to a property improvement plan dated **December 15, 2016**, which is incorporated into the Franchise Agreement (the "PIP"). The PIP contains distinct phases, and all work pursuant to the PIP was required to be completed by **March 2023**" (See Motion, Page 2, Footnote 2, Emphasis added). Hilton acknowledges that Debtor had until at least March 2023 to complete the PIP,[4] a duration of over six years. This is a long-term financial commitment requiring substantial work by both parties. The nature of the PIP work and the timeline for completion is not necessarily black and white. The work to be completed pursuant to the PIP has required significant time and funds to complete, along with continued coordination with Hilton on the numerous phases and timelines.

To date, Debtor has spent over $1.5 million towards completion of the PIP (See Vasani Statement). As a result, the Debtor is closer to compliance with the Hilton branding requirements than it has been since the PIP process began over six years ago. Yet, in the Motion, Hilton states that "Hilton Franchise's well established reputation to the general public is at risk the longer that the Facility remains non- compliance with brand standards…. The balancing of the harm tips in favor of Hilton Franchise, and relief from stay under Section 362(d)(1) is appropriate." (See Motion, Page 15). But this cannot be the case. The PIP process envisioned a lengthy and costly process, during which the Debtor would technically **not** be in full compliance with the Hilton branding

---

[4] Notwithstanding anything to the contrary stated herein, Debtor does not agree that they are in default or that there was a clear and hard deadline of March 2023 to complete the PIP.

requirements. It is hard to believe that Hilton allowed the Debtor to seriously "harm" the

Hilton brand during the PIP process, which Hilton agrees would last over six years.

Debtor has proposed a plan to fully comply with the PIP by the end of 2024. An

additional, comparably short period of time, cannot truly cause such harm to the Hilton

brand, especially given the substantial progress that Debtor has made to date. Further, the

Debtor's hotel is highly ranked by its guests. On Tripadvisor.com, the Debtor's hotel is

currently ranked the number one hotel in Sidney, Ohio. The hotel also has the highest

rating on Hilton's own website in the area.[5] These particular rankings are made by loyal

Hilton customers who have certain expectations for the brand, and based on these

reviews, are clearly satisfied.

   Given these facts, it is unclear to the Debtor how it could possibly be harming the Hilton

brand. On the other hand, if the Motion is granted, substantial harm would be caused to the

Debtor. Hilton states that it "seeks to insure and, if necessary, compel the Debtor to satisfy its

non-monetary post-termination obligations to de-identify the Facility by, (i) all billboard signs,

interior signs, exterior signs (whether located on or off the premises), entrance signs, forms of

display, guest room supplies and equipment, and all other items bearing any of Hilton

Franchise's registered service marks and trade names and logos; (ii) listings in telephone

directories, the internet, web sites, travel guides, hotel indices, or similar guides, and all other

publications or forms of media; and (iii) all of Hilton Franchise's proprietary materials,

including, but not limited to, operations and training manuals, guest cards, stationary, policy

statements, computer hardware, and licensed software." (See Motion, Pages 2, 3). If Hilton is

successful in obtaining relief from stay as requested in the Motion, not only has Debtor lost the

---

[5] This ranking, 4.5 out of 5 stars, is shared by some other hotels in the area, but there is no hotel ranked higher.

benefit of its substantial investment in the Hilton franchise, it will be faced with a costly

financial burden, and a significant decrease in income while Debtor rebrands and updates its

listings in phone, web sites, and travel guides, among other issues.

It should also be noted that Debtor has just entered into a multi-year commitment

with a major international company which will generate substantial revenue for the

Debtor and the Hilton brand. Puzzlingly, this was actually done with the cooperation of

Hilton, and Hilton has continued to coordinate with the Debtor, even after the Motion

was filed.

Given that Debtor was permitted to operate under the Hilton flag during the entire

PIP period, that significant progress has been made in completing the PIP, that the only

thing Debtor needs to complete the PIP is a short additional period of time, and the

Debtor's high rankings and positive reviews on multiple websites, there will be no

"damage" to the Hilton brand.

The prejudice to Debtor, after investing over $1.5 million dollars and completing

a significant portion of the PIP, compared to the risk to Hilton if Debtor were to continue

use of the Hilton brand, weighs heavily in favor of Debtor and the Court should deny the

Motion.


**2.      The Bankruptcy Code permits the Debtor to assume the Hilton Franchise
        Agreement.**


Movant rests a significant portion of its argument on its assertion that the Hilton

Franchise Agreement cannot be assumed, for the reason that the Debor fails the "hypothetical

test" – that is, if the Franchise Agreement cannot be assigned it cannot be assumed.  This

"hypothetical test" has been rejected by cases in the Sixth Circuit and more recent Court

opinions.  *In re Ohio Skill Games*, 2010 WL 2710522 (Bankr. ND OH Eastern Division 2010)[6];

*In re Jacobsen*, 465 B.R. 102 (Bankr. ND MS 2011); *In Re Cardinal Industries, Inc.*, 116 B.R.

964 (Bankr. SD OH Eastern Division 1990).

 The issue in the Jacobsen case is virtually identical to the issue before the Court –

assumption of a franchise agreement.  The franchisor sought to prohibit the Debtor from

assuming the franchise agreement based upon its reliance on the exact cases cited by Movant, *In*

*re Catapult Entertainment, Inc.* and *In re West Electronics* and reliance by those courts on the

"hypothetical test" in regard to 11 *U.S.C.*§365(c)(1).

 The Jacobsen Court rejected this reliance on a "hypothetical test" when no assignment by

the Debtor was contemplated.  The language in the Jacobsen cases sums up the correct view of

the ability of a Chapter 11 Debtor to assume a franchise agreement:

> "To determine the applicability of  § 365(c)(1), Sonic advocates the utilization of the "hypothetical test" which emerged in the cases of  *In re West Electronics, Inc.*, 852 F.2d 79, 83 (3rd Cir.1988)*;  Perlman v. Catapult Entertainment, Inc., (In re Catapult Entertainment, Inc.),* 165 F.3d 747, 750 (9th Cir.1999)*, and In re Wellington Vision, Inc.,* 364 B.R. 129 (S.D.Fla.2007). Those decisions effectively held that under the "hypothetical test," a debtor could be precluded from assuming an executory contract even when the applicable law would not bar the assumption in the actual circumstances before the court, but would bar the assignment to a hypothetical assignee because, under applicable law, the non-debtor party could refuse performance to or from the hypothetical assignee. **This approach takes the somewhat nonsensical *106 path that would prevent the assumption of an executory contract if applicable law would preclude the assignment of that contract, even when no assignment was intended or contemplated**. (Emphasis added).
>
> Numerous courts have rejected the "hypothetical test" approach in favor of an "actual test" to determine whether applicable law excuses a non-debtor party to the executory contract from performance. See, *Summit Inv. & Dev. Corp. v. Leroux, 69 F.3d 608, 613 (1st Cir.1995);  Cajun Elec. Members Comm. v. Mabey (In re Cajun Elec. Power Co-op., Inc.),* 230 B.R. 693, 705(Bankr.M.D.La.1999)*;  In re Lil' Things, Inc.,* 220 B.R. 583, 587 *(*Bankr.N.D.Tex.1998*);  Texaco Inc. v. La. Land & Exploration Co.,* 136 B.R. 658, 669 *(*Bankr.M.D.La.1992*) (*concluding the West hypothetical test is incorrect for three primary reasons*); In re Hartec Enters., Inc.,* 117 B.R. 865, 871 (Bankr.W.D.Tex.1990)*; and  In re Footstar, Inc.,* 323 B.R. 566 (Bankr.S.D.N.Y.2005).*"

 This Court should follow the Jacobsen line of cases and reject the argument of Movant in

---

[6] A copy of this opinion is attached hereto as Exhibit "B"

regard to assumption of a franchise agreement.

3.      **The Bankruptcy Code permits the Debtor to cure any alleged default of the Hilton Franchise Agreement.**

Hilton's Motion states that "the Debtor's failure to complete Property Improvement Plan ("PIP") as and when required in the Franchise Agreement is a historic and incurable default under the Franchise Agreement". (See Motion, Page 7). This statement stands in direct contradiction to the actions of Hilton pre and post petition, up until the filing of the Motion and even after the filing of the Motion.

As stated in the Motion, "a debtor must cure most defaults arising from an executory contract that is not a real property lease – both monetary and non-monetary); *In re Eagle Creek Subdivision, LLC*, 397 B.R. 758 (Bankr. E.D.N.C. 2008)". Many Courts require that the default must be material or cause substantial economic detriment before a debtor is precluded from assuming an executory contract. See, *Eagle Creek* at 764, citing *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1092 (3d Cir.1990); *In re New Breed Realty Enters., Inc.*, 278 B.R. at 321. The alleged default is curable and there is no economic detriment to the completion of the PIP to either Debtor or Hilton.

Hilton acknowledges in the Motion that Debtor had over six years to complete the PIP process and allowed the Debtor to continue to operate during this time, even though Debtor was technically in noncompliance of Hilton brand standards. Debtor has been working for years with Hilton to bring everything to brand standards. If the failure to complete the PIP by the deadline asserted in the Motion was truly an "incurable" default causing significant harm to the Hilton brand, Hilton should have terminated the Franchise Agreement, thereby saving the Debtor

substantial financial and time commitment.

Instead, Hilton continued to work with Debtor, and has done so even after the filing of

the Motion. In post-petition communications with Hilton and its counsel, Hilton has encouraged

the PIP and its completion.  Debtor's latest PIP proposes to bring the Debtor to Hilton brand

standard by the end of 2024.  This is not an unreasonable timeline in light of the filings in this

case.  Debtor can cure the PIP default and has been working pre and post petition towards that

very result. Clearly the actions, or inactions of Hilton in the past show that the completion of the

PIP is a curable default and relief from stay should be denied.

Lastly, non-completion of a PIP pre-petition is a curable default in Chapter 11 bankruptcy

and to suggest otherwise would be in contravention of the Bankruptcy Code.   There are

numerous cases in which Chapter 11 Debtors are preparing, implementing, and completing PIPs

in their Chapter 11 cases, thereby curing defaults with their agreements[7].  Furthermore in the

case of *In re Nesbitt Portland Property, LLC*, it was Hilton specifically that worked with the

Debtor for the completion of the PIP[8].  For Hilton to suggest that the failure to complete the PIP

is an incurable default is completely contradictory to their actions in other cases and in

contravention to the rights of the Debtor under the Code.  Accordingly, the Motion should be

denied.


**4.      Hilton has not established the existence of "cause" under 11 U.S.C.§362(d)(1)
because their brand reputation is not at risk and their interests are adequately
protected.**


Movant goes to great lengths to argue that, because the Debtor did not complete the PIP

---

[7] In re Scarlet Hotels, LLC, 392 B.R. 698 (2008);
[8] 2013 WL 588958. USBC, C.D. California, N. Div.

by a designated time, "Hilton Franchise's well established reputation to the general public is at risk the longer that the Facility remains non-compliance (*sic*) with brand standards" (citation omitted).  (Motion, Page 15). Movant argues that "Hilliard's failure to complete the PIP reflects a failure of Debtor to adequately protect the interests of the Hilton franchise" (Motion, Page 13).

Debtor has already provided Hilton's counsel, at their request, with a "Sources and Uses of Funds" to complete the PIP. In addition to the facts set forth above, Hilton has been working continuously and constructively with the Debtor throughout the course of these Chapter 11 proceedings and has secured a multi-year commitment from a major international company. (See Vasani Statement). It defies logic to assert that Hilton franchisor is not adequately protected while the Hilton franchisor is securing a multi-year commitment for the Debtor's hotel, among the many other reasons stated herein.

IV. <u>CONCLUSION</u>:

Hilton has not and cannot meet its burden to show cause for the granting of the requested stay relief.  The prejudice to the Debtor significantly outweighs any potential harm to Hilton. In fact, what is clear from the interaction between Hilton and the Debtor is that Hilton wishes to continue its long-term relationship with the Debtor well into the future.  The Franchise Agreement can be assumed by the Debtor, any alleged default can be and is in the process of being cured, and the Hilton brand is adequately protected. Debtor is current on payment of all post-petition franchise fees. Hilton uses an inaccurate factual basis to support arguments and, as such, those alleged facts should be disregarded by the Court.  Accordingly, for all the reasons and authorities cited, Debtor prays that the Motion be denied and overruled, and for all just and proper relief.

Respectfully submitted,

/s/ Ira H. Thomsen
Ira H. Thomsen (0023965)
Darlene E. Fierle (0081217)
Denis E. Blasius (0082617)
140 North Main Street, Suite A
Springboro, Ohio 45066
937-748-5001
937-404-6630 (Fax)
ithomsen@ihtlaw.com
dfierle@ihtlaw.com
dblasius@ihtlaw.com

*Thomsen Law Group, LLC*
*Case Attorney and Counsel for*
*Debtors/Debtors-in-Possession*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 25, 2024, a copy of the foregoing was served on all registered ECF participants, electronically through the court's ECF System at the e-mail address registered with the court.

/s/ Ira H. Thomsen
Ira H. Thomsen (0023965)

# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | * | **Case No. 2:23-bk-53043** |
| **WELCOME GROUP 2, LLC,** *et al.,*[1] | * | **Chapter 11** |
| | * | **Judge Mina Nami Khorrami** |
| **Debtors.** | * | |
| | * | **Jointly Administered** |

**STATEMENT OF ABHIJIT ("ANDY") VASANI IN SUPPORT OF OBJECTION TO
HILTON FRANCHISE, LLC'S MOTION FOR RELIEF FROM AUTOMATIC STAY**

Abhijit (Andy) Vasani hereby submits the following Statement pursuant to 28 *U.S.C.*

§1746 in support of the Objection to the Hilton Franchise, LLC Motion for Relief from the

Automatic Stay.

1.     Debtor has spent over $1.5 million on complying with the Hilton Property

Improvement Plan ("PIP") for the Hampton Inn-Sidney (the "Hotel"). Between 2022 and 2023,

[1] The Debtors and the last four digits of their federal tax identification numbers are as follows:  Welcome Group 2, LLC (6795), Hilliard Hotels, LLC (6063), and Dayton Hotels, LLC (1123).  The Debtors' headquarters are located at 5955 E. Dublin Granville Road, New Albany, Ohio 45305.

over $750,000.00 has been spent on, among other items, the following:

    a.    Guest Room Showers:  Bulk bath amenities purchased and installed in every room.
    b.    New HVAC in breakfast and common areas.
    c.    Onity locks (RFID compliant)
    d.    New ceiling tiles
    e.    Removed old wallpaper and applied knockdown texture with Hilton approved paint in all guest rooms, meeting rooms, conference rooms and common areas through the hotel.
    f.    Install Hilton approved wallpaper in all guest bathrooms.
    g.    Upgraded landscaping and exterior paint.
    h.    Replaced pool equipment and new pool paint in the pool room as well as the pool itself.
    i.    Removed all wall mounted hairdryers and purchased new hairdryers for guest rooms.
    j.    Upgraded Hilton signage with new logos where applicable.

2.    In June 2023 and as part of the Hilton requirements, Debtor paid $21,373.00 to AT&T to purchase Wi-fi equipment.

3.    In September 2023, Hilton gave our architects access to the Hilton Design Portal.

4.    In October 2023, additional contracts were signed with AT&T as well as with JD Telecom, which were over $45,000.00, to install Wi-fi equipment to comply with the PIP.

5.    In November 2023, new computers and software were installed at the front desk per Hilton's requirements.

6.    In December 2023, partial exterior drawings were approved for renovation by Hilton.  Debtor continued working to obtain full approval.

7.    In January 2024, full exterior approval was received from Hilton.  Hilton approved and added our interior designer to their portal.  Proof of funds were sent to Hilton per Hilton's request.

8.    The Hotel migrated over to PEP, Hilton's new computer system, on November 27, 2023.  The Hotel is going live with Guest Messaging on April 22, 2024.  The Hotel installed

the Hilton required EMV credit card readers at the front desk and they are updated and in use.

9.      The Hotel is also in the beginning stages of installing UNOnet, Hilton's network system, which will eventually integrate the televisions with streaming services in the guest rooms.

10.      On or about February 2, 2024, Hilton contacted the general manager of the Hotel regarding securing a multi-year (3 year) commitment (the "Project") for a major international company for the Hotel.

11.      On February 22, 2024, Debtor received confirmation that Hilton had approved the "Project" and that it actually was the client that had selected the Debtor's Hotel.

12.      On February 27, 2024, the Debtor received the full scope of the room needs for the Project which amounted to $1.1 million of potential revenue.

13.      On March 6, 2024, Hilton advised the Debtor it was determining the best method to "load your inventory" for the Project.

14.      On March 20, 2024, Hilton emailed the Hotel's Revenue Manager regarding the rates to be used for the Project.

15.      On March 22, 2024, a representative of the Hotel sent a proposed "Welcome Letter" for the client to Hilton for review and approval.

16.      On Tripadvisor.com, the Debtor's hotel is currently ranked the number one hotel in Sidney, Ohio.

17.      The Debtor's hotel has the highest rating on Hilton's own website in the area.[2] These particular rankings are made by loyal Hilton customers.

18.      The Hotel is the preferred hotel by many international and national companies.

19.      The Hotel is invited by Hilton to submit and participate in RFPs which are only

---

[2] This rating, 4.5 out of 5 stars, is also shared by other hotels in the area.

sent to hotels meeting certain threshold of guest satisfaction and reputation.

20.     The Hotel continues to receive this invitation, and has secured over $1.5 million

in business related to the RFPs.

21.     In regard to the pending Chapter 11 proceedings, the Hotel is current on all post-

petition franchise fees.

22.     In regard to the pending Chapter 11proceedings, I presented to our counsel a PIP

that had been revised from a completion date from March 2025 to December 2024.  It is my

understanding that this revised PIP was sent to counsel for Hilton.


## **CERTIFICATION**

I hereby certify that the foregoing statements made by me are true to the best of my

knowledge and belief and that this Certification is executed under penalty of perjury.


/s/ Abhijit Vasani
_____

Abhijit (Andy) Vasani

# EXHIBIT B

In re Ohio Skill Games Inc., Not Reported in B.R. (2010)

2010 WL 2710522

---

KeyCite Yellow Flag - Negative Treatment

Disagreed With by In re Kazi Foods of Michigan, Inc., Bankr.E.D.Mich., August 4, 2011

2010 WL 2710522
Only the Westlaw citation is currently available.
(NOT INTENDED FOR PUBLICATION)
United States Bankruptcy Court,
N.D. Ohio,
Eastern Division.

In re OHIO SKILL GAMES INC, Debtor.
Ohio Skill Games Inc., Plaintiff,
v.
Pace–O–Matic, Inc., Defendant.

Bankruptcy No. 08–60560.
|
Adversary No. 08–6049.
|
July 8, 2010.

**Attorneys and Law Firms**

Michael J. Moran, Gibson & Lowry, Cuyahoga Falls, OH, for Plaintiff.

Jean R. Robertson, Ronald M. McMillan, Calfee, Halter & Griswold LLC, Cleveland, OH, for Defendant.

## MEMORANDUM OF OPINION (NOT INTENDED FOR PUBLICATION)

RUSS KENDIG, United States Bankruptcy Judge.

**\*1** The parties filed cross-motions for summary judgment pursuant to Federal Rule of Bankruptcy Procedure 7056. Plaintiff-debtor, Ohio Skill Games Incorporated (hereafter "Debtor"), seeks summary judgment on counts one and three of its complaint, while Defendant Pace–O–Matic, Inc. (hereafter "Defendant") seeks summary judgment on a count for declaratory judgment. The parties filed responses opposing one another's motions. The issues between the parties center on the status of a prepetition business contract between the parties.

The court has jurisdiction of this proceeding pursuant to 28 U.S.C. §§ 1334 and the general order of reference entered in this district on July 16, 1984. Venue in this district and division is proper pursuant to 28 U.S.C. § 1409. This is a core proceeding under 28 U.S.C. 157(b)(2). The following constitutes the court's findings of facts and conclusions of law under Federal Rule of Bankruptcy Procedure 7052.

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the Court.

### FACTUAL BACKGROUND

Debtor and Defendant were parties to an Amended and Restated Master Software License and Distribution Agreement dated April 29, 2007 (hereafter "Agreement"). The Agreement was signed by Michael Pace (hereafter "Pace"), Defendant's President and Chief Executive Officer, and Jay Young, Debtor's President. The Agreement amended a previous contract between the parties dating to 2004. At the time the Agreement was executed, Debtor was owned by three individuals: Jay Young, Jan Anasis and Mildred Kowell.

Defendant, designated as "Manufacturer" in the Agreement, designs and develops what it refers to as "skill-based amusement games." Debtor contracted to distribute the games as set forth in the Agreement (and is referred to as "Distributor" in the Agreement). The games utilize proprietary software, also designed and developed by Defendant. The Agreement contained clauses relating to Defendant's intellectual property, including section 2.5 captioned "License." At one point in the parties' relationship, Debtor had placed 3,500 games in Ohio, the peak of Debtor's distributorship under the Agreement.

The legality of the games that are the subject of the Agreement permeated the parties' relationship. (More detail on the legal challenges can be found in the Court's opinion dated April 21, 2009.) On October 25, 2007, laws governing the games were amended to remove the games from the definition of "skill-based amusement machine" under Ohio law. As a result, the games were no longer "skill" games, but games of chance, and therefore illegal.

At some point prior to October 2007, the State of Ohio seized the assets of Debtor, rendering performance of obligations under the Agreement impossible and Debtor effectively ceased operating. Most of the necessary duties, including collection of accounts, was temporarily shifted to Defendant, with Debtor's knowledge and consent.

**\*2** The parties met subsequently, had discussions on their future business involvement, including how to alter the games to make them legal skill games, but never reached a formal consensus on the parties' future relationship. The parties' dealings are complicated by Debtor's loss of a key employee, Jay Young, and Defendant's opposition to Grant Kowell stepping in the shoes of Mr. Young.

Although Debtor's assets were returned at some point at 2008, the parties' business relationship substantially deteriorated through this period, culminating in the issuance of a letter from Pace, in early February 2008, attempting to terminate the Agreement. As grounds, he cited the assignment of ownership interest from Mildred Kowell to her husband, Grant "Fuzzy" Kowell, as well as the lack of performance of "distribution functions" under the Agreement. Responsive correspondence on behalf of Debtor and/or its principals was issued on February 11, 2008. In turn, Defendant sent a second letter of termination, citing multiple breaches of the Agreement:

—Failure to use commercially reasonable efforts to actively increase the placement of covered games as stated in Paragraph 2.1.

—Failure to maintain an inventory of spare parts in violation of Paragraph 4.1(a).

—Failure to comply with any of the duties and obligations in Paragraph 4.1(b).

—Failure to properly operate and account for the Escrow Account referenced in Paragraph 4.2 or to see that referenced third parties were paid from said account.

—Failure of O.S.G. to pay hundreds of thousands of dollars in invoices from P.O.M. [Pace–O–Matic] which are now far past due, in violation of Paragraph 4.2 of the Agreement.

—Breach of Paragraph 7.2 by actual or *de facto* attempt to assign all duties, rights, and obligations under the Agreement to Grant "Fuzzy" Kowell, not to mention the unconsented to relinquishment of ownership of O.S.G. by two of its shareholders.

—Failure to utilize Game Distributor Agreements in violation of Paragraph 7.3 of the Agreement.

The letter was dated February 22, 2008 and signed by Mark N. Poovey, an attorney for Defendant.

Breaches of the Agreement are covered in Section 5.1:

> Notwithstanding the foregoing, either party shall have the right to terminate this Agreement for cause at any time should the other party materially breach any covenant, representation or warranty made herein. Prior to a termination on such basis, the non-breaching party will provide the breaching party with written notice that the breaching party is not in compliance with this Agreement and such breaching party shall have thirty (30) days following such notice to cure the alleged default to the satisfaction of the non-breaking party; provided however, that if such breach cannot be cured within such thirty (30) day period, but (a) the breach is capable of cure, (b) the breaching party commences to effect a cure within such thirty (30) days period and (c) the breaching party diligently pursues such cure, such party shall have a reasonable time to cure such default. Notwithstanding the foregoing, the non-breaching party may suspend performance under this Agreement during the cure period if the breach by the other party could reasonably be expected to result in a violation of applicable law.

**\*3** Debtor filed a chapter 11 case on March 1, 2008. On April 24, 2008, Debtor filed an amended complaint initiating this adversary proceeding, seeking declaratory judgment "determining the rights, status and obligations of the parties to the Agreement," an accounting of funds collected by Defendant under the Agreement, and turnover of said funds. Defendant answered the complaint

on May 19, 2008 and included counterclaims for declaratory judgment, breach of contract, recoupment, and accounting. Debtor now seeks to assume the contract; Defendant opposes the assumption. The Agreement contains a clause dealing with assignment.

### 7.2 Assignment

This Agreement and the duties, rights and obligations arising hereunder may be assigned by a party hereto only with the prior written consent of the other party which consent may not be unreasonably withheld; provided, that Manufacturer may assign this Agreement to any party directly or indirectly controlling it, controlled by it or under common control with it. For the purposes of this Section, "control" means the ownership of a majority of the equity interest in the entity and/or voting control.

### LAW AND ANALYSIS

### I. Summary Judgment Standard

Motions for summary judgment are governed by Federal Rule of Bankruptcy Procedure 7056, which incorporates Federal Rule of Civil Procedure 56, and states, in applicable part:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Bankr.P. 7056. The movant bears the initial burden of proof, being tasked with the "responsibility of informing the ... court of the basis for its motion, and identifying those portions [of the record] ... which it

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 32.3 (1986). In reviewing the evidentiary materials, the facts and inferences arising therefrom are to be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the movant successfully demonstrates the absence of apposite factual issues, the non-movant must refute the suggestion by establishing, from more than mere pleadings, the existence of facts giving rise to material questions. *Celotex,* 477 U.S. at 324 (referencing Fed.R.Civ.P. 56(e)).

### II. Assumption of the Agreement

Debtor seeks to assume the contract under 11 U.S.C. § 365(a):

> (a) Except as provided in section 756 and 655 of this title and in subsections (b), (c) and (d) of this section, the trustee[1], subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

Although Debtor may challenge the defaults listed in the termination letters, Debtor argues that the defaults are inconsequential because, as of the petition date, Debtor still had an opportunity to cure the defaults, relying on section 365(b):

> *\*4* (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default ..., and
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting

from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

Defendant opposes the assumption, arguing that Debtor's inability to assign the contract leaves it without the option to assume the contract. Defendant's position is founded on 11 U.S.C. § 365(c):

(c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to any entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(B) such party does not consent to such assumption or assignment....

The parties do not dispute the applicability of section 365, nor the existence of an executory contract. Defendant clearly does not consent to the assumption or assignment of the Agreement by Debtor. The basic issue is whether the contract can be assumed by Debtor. If the Agreement cannot be assumed, there is no reason to discuss cure of the Agreement.

The controversy between the parties is based on differing interpretations of section 365(c)(1)(A). Defendant, espousing the majority viewpoint, argues that since "applicable law" bars assignment of the underlying agreement, both assumption and assignment are prohibited. *See Perlman v. Catapult Entertainment, Inc. (In re Catapult Entm't, Inc.),* 65 F.3d 747 (9th Cir.1999). Under this test, you presume that assignment is a foregone conclusion. As described in *Catapult,* "a debtor in possession may not assume an executory contract over the non-debtor's objection if applicable law would bar assignment to a third party, even where the debtor in possession has no intention of assigning the contract in question to any such third party." *Catapult* at 750 (citing *In re James Cable,* 27 F.3d at 537 (characterizing § 365(c)(1)(A) as presenting "a hypothetical question"); *In re West Elecs. Inc.,* 852 F.2d 79, 83 (same)). Actual intent is irrelevant.

Debtor's position is based on the minority viewpoint: that the agreement can be assumed under application of an "actual" test. *See, e.g., Institut Pasteur v. Cambridge Biotech,* 104 F.3d 489 (1st Cir.1997); *In re Aerobox Composite Structures, LLC,* 373 B.R. 135 (Bankr.D.N.M.2007). Under this view, the actual intent of the party is material. If assignment is not contemplated, the applicable law cannot bar assumption.

*5 The Sixth Circuit Court of Appeals has not rendered an opinion on this particular conflict, but it did expound on section 365 in *Rieser v. Dayton Country Club Co. (In re Magness),* 972 F.2d 689 (6th Cir.1992), which is instructive. The Magness court specifically stated it was not addressing assumption: "we should make clear that we are not dealing with the right to *assume* the membership with all its baggage, thus permitting the debtor to play golf." *Magness* at 694. Assumption would have imposed duties, including the payment of dues, burdening the estate. In *Magness,* the chapter 7 trustee sought to assign, through an auction process, Debtor's golfing membership interest in a country club. The golfing membership interest was a special interest in the club because golfing memberships were limited in number, attendant with higher fees, and subject to specific transfer limitations. Members who wanted to advance to a golfing membership were required to pay a substantial fee and be placed on a waiting list. If successful, the trustee's assumption of the contract and sale would have bypassed the club's golfing membership system, potentially allowing someone who was not on the waiting list to obtain a golfing membership.

The case discusses the inter-play between bankruptcy code sections 365(c)(1) and 365(f)(1). Generally, a trustee can assume an executory contract under 11 U.S.C. § 365(a), The same general principle exists, by virtue of 11 U.S.C. § 365(f)(1), for assignments. Section 365(c)(1) provides the exception to these general rules. In *Magness,* the court reconciled the duplicate use of "applicable law" in both 365(c)(1)(A) and 365(f), ultimately determining that the "applicable law" referred to in section 365(c)(1) "address[es] the interest of the non-debtor third parties, rather than law relating to general prohibitions or restrictions on assignment of executory contracts covered by § 365(f)." *Id.* at 696. The court ruled against the trustee, concluding that the club could not be forced to accept performance from third-parties because the contract was personal between the debtor and the club. As a result, the trustee could not assign the interest.

The court recognizes that *Magness* attempted to address the difference between "applicable law" in section 365(f)(1) and use of the same term in section 365(c)(1). However, the definition cannot change based on the fact that the term "applicable law" is not used in section 365(a). As a result, this court must follow the interpretation of the *Magness* court. The section 365(c)(1)(A) exception applies equally to assumptions or assignments, as the specific language demonstrates. Thus, the court finds that, under the facts presented, the proper way to read the exception is in the following light: the debtor may not assume the Agreement if applicable law excuses Defendant from accepting performance from or rendering performance to a non-debtor third party regardless of clauses in the Agreement governing the rights to assign or delegate duties, Because the assumption would maintain the parties relationship under the Agreement, this is not a situation where Defendant will be forced to accept performance from an unknown third party when it contracted for those services from Debtor. Essentially, this is also equivocates adoption of Debtor's position and employment of the actual test.

**\*6** This understanding does not create an absurd result. Debtor wants to assume the Agreement. The Agreement is the soul of Debtor's business and the inability to capitalize on the Agreement forced Debtor into Chapter 11. There has been no discussion of assigning this contract to a third party. Rather, Debtor seeks to cure the alleged defaults and continue operating under the Agreement. The ability to assume the contract is key to Debtor's survival. Thus the court would be remiss in overlooking the assumption issue in favor of the assignment issue. This type of factual distinctions has been noted. *See, e.g., Murray v. Franke–Misal Tech. Group, LLC (In re Supernatural Foods, LLC),* 268 B.R. 759 n. 30 (Bankr.M.D.La.2001) (finding that application of the "actual test" under section 365(c) arises "exclusively within the Chapter 11 context, where a debtor in possession wishes to assume executory contracts to maintain them for the estate, if applicable law prohibits only assignment, assumption is allowable"). On facts where assumption alone is contemplated, not assignment, courts tend toward adoption of the actual test, or an interpretation favoring assumption. *See Summit Inv. and Dev. Corp. v. Leroux,* 69 F.3d 608 (1st Cir.1995) (following chapter 11 bankruptcy filings by two general partners, court rebuffed non-bankruptcy general partner's attempt to enforce ipso factor provision in partnership agreement); *In re Footstar, Inc.,* 323 B.R. 566 (Bankr.S.D.N.Y.2005); *In re GP Express Airlines,*

*Inc.,* 200 B.R. 222 (Bankr.M.D.Neb.1996); *In re American Ship Bldg. Co., Inc.,* 164 B.R. 358 (Bankr.M.D.Fla.1994); *Texaco Inc. v. Louisiana Land and Exploration Co.,* 136 B.R. 658 (M.D.La.1992); *In re Cardinal Indus., Inc.,* 116 B.R. 964 (Bankr.S.D.Ohio 1990), Consequently, the distinction between assuming for the purposes of assigning versus only assuming an executory contract are noteworthy.

In some cases, such as *Magness,* the two cannot be severed because the inability to assign the contract would result in rejection. This is most notably seen in chapter 7 cases where a trustee seeks to sell the estate's interest in a contract but has no intention of performing under the contract. In a situation involving a chapter 7 trustee, the section 365(c)(1) exception would alleviate a party from accepting performance from, or rendering performance to, a chapter 7 trustee, thereby protecting the "personal" nature of the contract.

Allowing "applicable law" to drive the assumption determination, when said law may be entirely inapplicable, would allow creditors a potential windfall through a fast exit from their duties and obligations. Here, if Debtor cannot assume the contract, the likelihood of successful reorganization plummets. Allowing Debtor to assume the contract merely puts the parties in the position they were in on the day the bankruptcy was filed, leaving them both with the benefits, and detriments, of their bargain.

**\*7** Defendant wants to be relieved of this contract by relying on "applicable law" that prevents assignment. Upon review of the Agreement, this would provide Defendant *more* relief than contracted. The Agreement does not prohibit assignment, but merely conditions it: "This Agreement and the duties, rights and obligations arising hereunder may be assigned by a party hereto only with the prior written consent of the other party which consent may not be unreasonably withheld...." This is not a case where assignment was prohibited outright, but adopting Pace's position would have that result.

Considering all of the above, the court finds that, as of the petition date, Debtor could assume the contract subject to the default conditions set forth in 11 U.S.C. § 365(b). Section 365(c)(1)(A) is not a bar to assumption on the facts of this case.

### III. Cure of the Agreement

After finding the Agreement can be assumed by Debtor, the court must now address the default issues raised by the parties. 🚩 Section 365(b) contains three requirements for effectuating a cure of prepetition defaults: (1) cure the default, or provide adequate assurance of a prompt cure; (2) compensate, or provide adequate assurance of such compensation will be made, to a party who has suffered an "actual pecuniary loss;" and (3) "provide adequate assurance of future performance." Debtor alleges it can provide the necessary compensation or adequate assurance to provide a cure under 🚩 section 365(b), while Defendant disagrees. With regard to any monetary defaults, Debtor contends that the money Pace collected for Debtor under the Agreement could be used to cure the defaults. Defendant points out that Debtor has essentially ceased to exist, has no employees or operations, no money, and further argues that certain items simply are not capable of cure. Defendant argues that it is impossible for Debtor to provide adequate assurance of future performance because Debtor does not have qualified personnel to operate the business. It is clear that Defendant objects to Mr. Kowell taking over duties previously handled by Jay Young. The court will review the allegations of default individually.

Section 5.1 of the Agreement requires a party to provide written notice of termination for a "material" breach and allow the breaching party a minimum thirty days to cure the alleged breach. It is clear that prior to Debtor's filing, two termination letters were issued. The first was signed by Pace. It is attached as Exhibit D to Debtor's motion for summary judgment and is undated. Debtor claims that it received this letter "sometime in the first week of February." (Debtor's M. Summ. J., p. 7). Defendant does not dispute this contention, or argue for an earlier date, so the court will find that Debtor had notice of the termination on February 7, 2008. Consequently, as of the filing date of the petition, time remained for Debtor to cure the Agreement. Similarly, a second letter of termination was issued on February 22, 2008, so time to cure the breaches referenced in that letter also remained as of the petition date. The Agreement was not terminated prior to Debtor's bankruptcy filing.

**\*8** In the first letter, Defendant cites the transfer of ownership of Debtor from Mildred Kowell to her husband as a breach. This is reiterated in the second letter, where Defendant cites a "[b]reach of Paragraph 7.2 by actual or *de facto* attempt to assign all duties, rights, and obligations under the Agreement to Grant "Fuzzy" Kowell, not to mention the unconsented to relinquishment of ownership of O.S.G. by two of its shareholders." (Debtor's M. Summ. J., Exh. D and E). Paragraph 7.2

governs assignment of the Agreement and does not prohibit the action complained of by Defendant. The clause governs assignment of the Agreement, not a transfer of stock by owners of one of the contracting parties. The change of ownership of Debtor did not alter the Agreement, nor the identity of the parties to the Agreement. The Agreement was made by Ohio Skill Games, Inc., not with an individual. The court finds no foundation for the alleged breach. At a minimum, it is not a "material" breach under' the Agreement. Consequently, no cure is required.

The first letter also contains a general allegation that Debtor was failing to perform the "distribution functions or other duties required of Ohio Skill Games under the Agreement." (Debtor's M. Summ. J. Exh. D). This apparently relates to Debtor's obligations under Section 2 of the Agreement. However, the allegation of breach is vague. The second letter is more specific, but references one breach of Section 2: "[f]ailure to use commercially reasonable efforts to actively increase the placement of covered games as stated in Paragraph 2.1." Under Section 2.2, the Agreement states: "[t]he minimum net Covered Game Placement requirements for Ohio have already been met."[2] No maximum requirements are established in the Agreement, nor are additional benchmarks outlined. As a result, Defendant's position is untenable. The court finds that when the Agreement was signed, Debtor had placed the required number of games in Ohio and thereby satisfied its obligations under Paragraph 2.1. The Agreement failed to establish any further performance benchmarks.

The bulk of the remaining items of default relate to Debtor's duties under Section 4 of the Agreement, titled "Game Servicing." The alleged breaches include:

—Failure to maintain an inventory of spare parts in violation of Paragraph 4.1(a).

—Failure to comply with any of the duties and obligations in Paragraph 4.1(b).

—Failure to properly operate and account for the Escrow Account referenced in Paragraph 4.2 or to see that referenced third parties were paid from said account.

—Failure of O.S.G. to pay hundreds of thousands of dollars in invoices from P.O.M. [Pace–O–Matic] which are now far past due, in violation of Paragraph 4.2 of the Agreement.

Additionally, Defendant claims a breach of Section 7.3: "[f]ailure to utilize Game Distributor Agreements in

In re Ohio Skill Games Inc., Not Reported in B.R. (2010)

2010 WL 2710522

violation of Paragraph 7.3 of the Agreement."

Questions of fact abound in ascertaining whether these alleged defaults can be cured. For example, Debtor contends it has an inventory of spare parts and, to the extent Defendant finds it inadequate, it is willing to acquire an amount sufficient to cure the default. No supporting documentation has been was provided to describe Debtor possessed when the termination letter was issued, nor are their specifics on the how, or why, the parts inventory was deficient.

**\*9** Further, the parties did not provide an itemization of the amounts collected by Defendant following seizure of Debtor's assets. To the extent that Debtor relies on those monies as both a cure and adequate assurance, the amount is material. It is also pertinent to Defendant's claims that hundreds of thousands of dollars are due to Defendant. The other items similarly involve questions of fact which are not appropriate for the court to decide on a motion for summary judgment.

### CONCLUSION

Since Debtor is not contemplating assignment,  11

U.S.C. § 365(c)(1) does not bar assumption. However, Debtor's ability to assume is subject to its ability to cure the defaults as outlined in 🏴 section 365(b). Questions of fact preclude summary judgment on the issue of whether Debtor can effectuate a cure, Consequently, the Court will grant, in part, Debtor's request for summary judgment on count one, the declaratory judgment count. Assumption of the Agreement will be approved subject to 🏴 section 365(b), In the same vein, Defendant's motion for summary judgment will be denied.

Debtor also moved for summary judgment on count three of its amended complaint seeking turnover. The court finds Debtor failed to fully develop arguments on this issue, instead focusing on count one. As a result, the Court finds that Debtor did not establish either the absence of genuine issues of material fact or its entitlement to judgment as a matter of law on count three. Consequently, the motion for summary judgment will be denied as it pertains to the count for turnover.

An order will be entered forthwith.

**All Citations**

Not Reported in B.R., 2010 WL 2710522

**Footnotes**

1        The parties do not dispute that the Debtor, as debtor-in-possession, can exercise the rights of the trustee. *See also* 11 U.S.C. § 1107(a).

2        The only issues presented in this adversary pertain to the Ohio activities.

End of Document                                                  © 2024 Thomson Reuters. No claim to original U.S. Government Works.