IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| In re<br><br>WELCOME GROUP 2, LLC, *et al.*[1]<br><br>Debtors. | Case No.: 2:23-bk-53043<br><br>Chapter 11<br><br>Judge Mina Nami Khorrami<br><br>Jointly Administered |

### OPPOSITION OF HILTON FRANCHISE HOLDING TO DEBTORS MOTION FOR ORDER AUTHORIZING ASSUMPTION OF FRANCHISE AGREEMENT

Now comes Hilton Franchise Holding LLC ("Hilton"), by and through its undersigned counsel, and as a creditor and party-in-interest in this case, and hereby sets forth its opposition to the Motion of Debtor Hilliard Hotels, LLC ("Hilliard" or the "Debtor") for an Order Authorizing Assumption of the Franchise Agreement between the Debtor and Hilton (the Assumption Motion") (ECF No. 420) as follows:

### I.  FACTUAL BACKGROUND[2]

#### A.    Hilton Franchise Holding LLC.

1.       Hilton's affiliate, Hilton International Holding LLC ("HIH") owns the service marks Hampton by Hilton® as well as various related trade names, trademarks and service marks (certain of which are on the principal register of the United States Patent and Trademark Office), logos, and

---

[1] This case is jointly administered with In re Dayton Hotels LLC, Case Number 2:23-bk-53044 and In re Hilliard Hotels, LLC, Case Number 2:23-bk-53045.

[2] Unless otherwise noted, factual support for this Motion is presented in the Certification of Shruti Buckley and the exhibits thereto, filed in this proceeding in connection with Hilton's Stay Relief Motion (defined, *infra*) on February 28, 2024, at ECF No. 166-1 (the "Buckley Cert.").

derivations thereof.

2.  These marks, together with all other business names, copyrights, designs, distinguishing characteristics, domain names, emblems, insignia, logos, slogans, service marks, symbols, trademarks, trade dress and trade names (whether registered or unregistered) used in the system (as defined in the applicable license or franchise agreement) are hereinafter collectively referred to as the "Hilton® Marks". HIH has granted Hilton the right in the United States to license the use of the Hilton® Marks in connection with the franchising of hotels.

3.  Hilton has developed a system for the promotion and assistance of independently owned and/or operated guest lodging facilities designed to enable such facilities to compete effectively in the hospitality market (which system is hereinafter referred to as the "Hilton System").

4.  The Hilton System includes, but is not limited to, common use and promotion of certain Hilton Marks, copyrights, trade secrets, centralized advertising programs, referral programs and centralized support functions such as a nationwide computer reservation system. Hilton, from time to time, revises and updates the Hilton System.

5.  Hilton and HIH or their predecessors have continuously used each of the Hilton® Marks since the date of their registration and those service marks are in full force and effect pursuant to 15 U.S.C. § 1065. Hilton has given notice to the public of the registration of the Hilton® Marks as provided in 15 U.S.C. § 1111, and Hilton uses or has used the Hilton® Marks as abbreviations of its brand name.

6.  Many hotels operating under the Hilton® Marks are franchised hotels that are independently owned and operated by third-party franchisees. Hilton allows its franchisees, pursuant to individual license or franchise agreements, to operate their guest-lodging facilities utilizing the Hilton® Marks and System (as defined in the applicable license or franchise agreement).

2

7.      Through the Hilton System, Hilton markets, promotes and provides services to its franchisees throughout the United States. To identify the origin of their services, Hilton allows its franchisees to utilize the Hilton® Marks and to otherwise associate their facilities' services with the Hilton® Marks and System.

**B.      The Franchise Agreement.**

8.      On June 30, 2017, Hilliard and Hilton entered into a Franchise Agreement (the "Franchise Agreement") relating to the operation of a Hampton Inn by Hilton® hotel located at 1600 Hampton Court, Sidney, Ohio 45365 (the "Facility"). A copy of the Franchise Agreement is attached at **Exhibit "A"** to the Buckley Cert. (ECF No. 166-2).

9.      Pursuant to Section 8 of the Franchise Agreement, Hilliard is required to pay Hilton "Monthly Fees", including royalties, system assessment fees, taxes and other charges ("Franchise Fees"). Franchise Agreement at Section 8.1. The Franchise Fees are payable on or before the fifteenth (15th) day of each month. Id. at Section 8.2.2. Under Section 14 of the Franchise Agreement, non-payment of these fees is an event of default. Id. at Section 14.1.1.

10.     The Franchise Agreement is for a term of fifteen years and expires on June 30, 2032. There are no renewal rights.  See Franchise Agreement; Section 3 and Addendum.

11.     When entering into the Franchise Agreement, Hilton informed Hilliard that certain renovations to the Facility were necessary for it to meet Hilton System requirements. Accordingly, Hilliard agreed to a property improvement plan dated December 15, 2016, which is incorporated into the Franchise Agreement (the "PIP"). See Exhibit A to Franchise Agreement. The PIP contains distinct phases, and all work pursuant to the PIP was required to be completed by March 2023. Id. Failure to complete the PIP by the relevant dates set forth in the addendum to the Franchise Agreement is an event of default under the Franchise Agreement. See id. at Section 14.

3

**C.**    **The Debtor's Bankruptcy Filing.**

12.    On September 1, 2023, Hilliard filed a voluntary Chapter 11 bankruptcy proceeding with this Court. Debtor has continued to operate post-petition as a debtor-in-possession.

13.    At the time of the bankruptcy filing, Hilliard was indebted to Hilton in the amount of at least $133,699.99 in Franchise Fees under the Franchise Agreement (the "Pre-Petition Indebtedness"). As noted above, Hilliard's failure to pay the Pre-Petition Indebtedness is an event of default under the Franchise Agreement. See Franchise Agreement at Section 14.1.1.

14.    On October 31, 2023, Hilton filed a proof of claim herein asserting a claim in the amount of the Pre-Petition Indebtedness, which claim was designated by the Clerk as Claim No. 6-1 on the Claims Register (the "Hilton POC"). No objection has been filed regarding the Hilton POC.

15.    Hilliard did not timely complete the required PIP and has been out of compliance with the PIP for over twenty-eight (28) months since March of 2023 – almost two and one half years. Hilliard's failure to complete the PIP by the required benchmark dates is a separate event of default under the Franchise Agreement. See id. at Section 14.

16.    This bankruptcy case has been pending for twenty-two months and the Debtor did not move to assume the Franchise Agreement (and cure its defaults thereunder) until twenty-one of these months had elapsed.

**D.**    **Hilton's Stay Relief Motion.**

17.    On February 28, 2024, Hilton filed a motion for relief from the automatic stay (Docket No. 166) (the "Stay Relief Motion") to terminate the Franchise Agreement due to, among other things, Hilliard's alleged incurable default relative to its failure to meet its obligations under the PIP (the "PIP Defaults"). In response, the Debtor filed its *Objection of Hilliard Hotels, LLC to Hilton Franchise Holding LLC's Motion for Relief from Automatic Stay* (ECF No. 191).

4

18.     After a preliminary hearing held on March 27, 2024, the Court determined to bifurcate the Stay Relief Motion to first decide whether the Debtor' ability to assume the Franchise Agreement was prohibited as a matter of law under 11 USC § 365 in the absence of Hilton's specific consent by application of the "hypothetical test."

19.     On July 10, 2024, the Court entered an opinion and order applying the "actual test" and determining that Hilton's declination to consent to assumption was not in and of itself sufficient to preclude assumption (the "Opinion and Order") (ECF No. 249). Accordingly, the Stay Relief Motion was denied only to the extent it was based on the theory that assumption was precluded as a matter of law. The Court ruled that the automatic stay would remain in effect pending a final hearing on all remaining matters related to the Stay Relief Motion.

20.     The remaining issues to be determined on the pending Stay Relief Motion include, *inter alia*, whether Hilton is adequately protected and whether the Franchise Agreement is assumable by the Debtor due to the existence of alleged incurable defaults thereunder.

**E.     Hilton's Motion to Compel Assumption or Rejection.**

21.     As of February 7, 2025, nearly a year after the Stay Relief Motion had been filed, Hilliard still had not moved to assume or reject the Franchise Agreement, nor had it filed a proposed plan of reorganization addressing the assumption or rejection of the Franchise Agreement. Accordingly, on that date Hilton filed Motion to Compel Debtor to Assume or Reject the Franchise Agreement (the "Motion to Compel") (ECF No 349).

22.     As set forth in the Motion to Compel, to the extent that the Debtor elected to file a motion to assume the Franchise Agreement, same would join the remaining issues from the Stay Relief Motion for a disposition in the context of any motion to assume. Stated otherwise, inasmuch as Hilton was seeking stay relief based on a lack of adequate protection and inability to cure, the

5

Debtor would have to address and establish those items to succeed on a motion to assume. Therefore, a Court decision on the Motion to Assume, as a practical matter, would likewise resolve all remaining issues on the Stay Relief Motion.

**F.      The Debtor's Disclosure Statement/Plan and its Motion to Assume.**

23.     On February 28, 2025, the Debtor filed a Disclosure Statement (the "Disclosure Statement" and proposed plan of reorganization (the "Plan") (ECF Nos. 362 and 363, respectively) which pleadings, *inter alia*, provided for the Debtor's assumption of the Hilton Franchise Agreement and for the substantive consolidation of all of the related debtor cases.

24.     The Plan and Disclosure Statement were filed jointly with the other related debtors in these jointly administered proceedings and articulated that the jointly administered Debtors together had up to $1,000,000 available to fund their monetary and non-monetary cure obligations under the Plan, albeit there was no information as to any allocation of said funds between the debtors or how much each debtor would need, or have access to, to satisfy its respective plan obligations.

25.     Specifically, the Plan provided at Article 6.0 that

> The membership interests in Welcome 2, Dayton Hotels, and Hilliard (collectively, the "Membership Interests") are owned 100% by InnVite Opco, Inc. ("InnVite Opco") as more fully set forth in the Disclosure Statement. In accordance with the Plan and as described in Article III above, InnVite Opco will not retain its membership interests in the Debtors. InnVite 2 LLC ("InnVite 2") or its designee will obtain the Membership Interests in exchange for the sum of $500,000.00 (the "InnVite 2 Payment") to be paid on the Effective Date and will become the sole owner of the Reorganized Debtors. In addition, InnVite 2 will provide additional funds up to $500,000.00 for renovations to the Debtor Hotels, as required by Franchisors and as necessary to remain competitive.

26.     More specifically, at Section 7.5, the Disclosure Statement provided

> InnVite 2 LLC, who will succeed in interest to InnVite Opco, Inc. as the sole member of the Debtors, will infuse $500,000.00 into the Debtors primarily to cure any pre-petition franchise fee arrearages of Hilton Holding Company, LLC and Super 8 Worldwide, Inc., and fund the PIP, as will be

6

more fully addressed in the Plan. InnVite 2 LLC will also commit to up to an additional $500,000.00 to be infused into the Debtors to fund the PIP to the extent it cannot be funded by the ongoing operations of the Debtors and/or the set-aside in the Projections for completion of the PIP and any other needed capital improvements.

27.    At Article 5.01, the Plan acknowledges that Hilton filed a proof of claim in the amount of $133,669 and estimates the actual amount of the claim to be closer to $130,000.[3] Between the two franchisors, it appears that the Debtor would need $175-200,000 to cure its monetary defaults.

28.    In terms of the within Debtor, the Plan and Disclosure Statement did not specify how and when the within Debtor would address its PIP defaults. Moreover, the financial projections attached to the Plan did not include a line item for completion of the PIP or otherwise address how the Debtor would fund its obligations to perform the PIP.

29.    The Disclosure Statement was originally set for hearing on May 30, 2025.  Ultimately, the Debtor determined that it was not efficient, or practical, to proceed with the confirmation process unless and until there was a resolution of the issue of whether the Debtor would be able to assume the Franchise Agreement. Accordingly, the Disclosure Statement hearing was adjourned without date, pending the filing of an Amended Plan and Disclosure Statement that would abide a resolution of the assumption issue

30.    The Court entered several Consent Orders between the Debtor and Hilton adjourning the Debtor's time to respond to the Motion to Compel and/or otherwise setting scheduling parameters. The most recent Consent Order was entered on June 18, 2025; ECF No 415) and provided that the Debtor would file a Motion to Compel no later than June 27, 2025, that Hilton would file its Opposition by July 9, 2025, and the Court would conduct a hearing on the matter on July 22, 2025.

---

[3] The Plan actually states $47,000 as the estimated amount but it appears that this value was transposed with the amount for the claim by another franchisor as to a hotel operated by a related debtor in the amount of $57,931.

7

31.    During this time, Hilton advised that it would not consent to the assumption of the Franchise Agreement, nor would it consent to the continued operation the Facility as Hampton Inn® but that it would consider agreeing to allow the Facility to convert to the Spark® brand also offered by Hilton. The Debtor has explored the possible conversion scenario but as yet, has not agreed to convert the Facility to a Spark® hotel.

32.    On June 27, 2025, the Debtor filed the Assumption Motion which provided, *inter alia,* that, as to financial defaults, the Debtor will cure any pre-petition payment arrearages within thirty (30) days of Court approval of assumption of the Franchise Agreement and any other approval which may be required to release said funds. The Assumption Motion does not identify what other approvals may be required or how long that could delay actual payment.

33.    The Assumption Motion asserts, somewhat conclusorily, that Hilton has not suffered any actual pecuniary loss relative to the Franchise Agreement

34.    In terms of the PIP Defaults, the Assumption Motion proposes that the Debtor will (i) within 30 days after Court approval of assumption, hire a professional interior design/architecture firm to assist in completing the PIP (ii) promptly file for a permit for  exterior work and begin the exterior work upon approval of the permit (iii) within ninety (90) days from an undefined start date,  prepare and submit their design to Hilton for approval; (iv) within thirty (30) days of receiving design approval from Hilton, take all necessary steps required to initiate the project including ordering necessary items; (v) begin construction/installation no more than thirty (30) days after receiving the items ordered; and (vi) complete construction/installation within nine (9) months thereafter. Thus, if everything proceeds perfectly with no delays or complications and assuming the Debtor receives all of the contemplated approvals immediately upon ordering without any lag for delivery (both of which would be unrealistic for a construction project) it would

8

be at least 14 months plus before the work would be completed and the Facility would be compliant
with Hilton standards. This translates to no earlier than October 2027 which would be 4 and ½
years after the renovations were supposed to have been completed. Additionally, at that point,
there would be less than 5 years left in the term of the Franchise Agreement.

## II.  LEGAL ARGUMENT

### A.  <u>The Debtor Cannot Assume the Franchise Agreement because it Cannot Satisfy the Requirements of 11 U.S.C. 365 (b)</u>

(i)     *Assumption, Generally.*

35.     "At heart, a motion to assume should be considered a summary proceeding,
intended to efficiently review the trustee's or debtor's decision to adhere to or reject a particular
contract in the course of the swift administration of the bankruptcy estate." *In re Orion Pictures
Corp.*, 4 F.3d 1095, 1098 (2d. Cir. 1993). Courts use a "business judgment" standard when
evaluating whether to permit a debtor to assumer or reject a contract. *In re Old Carco LLC*, 406
B.R. 180, 188 (Bankr. S.D.N.Y. 2009).

36.     A bankruptcy court order is required for a debtor to assume an executory contract.  11
U.S.C. §365(a).  The legislative history indicates that in permitting assumption, bankruptcy courts
must protect the non-debtors' bargain, including non-monetary considerations, under all contracts.
H.R. Rep. No. 595, 95th Cong. 2nd Sess. 348 (1978), <u>reprinted in</u> 1978 U.S. Code Cong. Ad. News
5963, 6304-6305. <u>See</u> <u>also</u> <u>In re Ionosphere Clubs, Inc.</u>, 85 F.3d 992, 999 (2nd Cir. 1996) (Congress'
intent in imposing cure and adequate assurance conditions on ability of bankruptcy debtor to assume
an executory contract was to ensure that contracting parties receive the full benefit of their bargain if
they are forced to continue performance).

37.     A contract is executory if the parties' obligations under the contract "are so far
unperformed that the failure of either to complete performance would constitute a material breach

9

excusing the performance of the other." In re Pacific Express, Inc., 780 F.2d 1482, 1487 (9th Cir.

1986) (citing Countryman, Executory Contracts in Bankruptcy: Part I, 57 Min. L. Rud. 439, 460)

(1973)) See also Enterprise Energy Corp. v. U.S. (In re: Columbia Gas Sys., Inc.), 50 F.3d 233 (3d

Cir.1995) (adopting Countryman definition).  The Franchise Agreement is an executory contracts

because of the ongoing material obligations of the franchisor and franchisee thereunder.  See e.g.,

In re Roving Corp., 6 B.R. 661 (Bankr. W.D. Tenn. 1980) (Burger King franchise agreement is

executory contract); see also In re Gunter Hotel Assoc., 96 B.R. 686 (Bankr. W.D. Tex. 1988); In re

Anne Cara Oil Co., 32 B.R. 643 (Bankr. D. Mass 1983); In re Moody, 31 B.R. 216 (Bankr. W.D.

Wis. 1983).

38.     In this case, the Franchise Agreement clearly constitutes an "executory contract"

within the meaning of Section 365 of the Bankruptcy Code as there is ongoing performance

required of the parties thereto and the failure of which would constitute a material breach.

Moreover, in the Opinion and Order, the Court noted that "the Parties do not dispute …that the

Franchise Agreement is an executory contract." *See* Opinion and Order, page 13.

39.     Where there has been a default in an executory contract, as with the Franchise

Agreement, a debtor or trustee must clear three (3) specific hurdles as a condition of assumption. 11

U.S.C. §365(b)(1).

> If there has been a default in an executory contract or unexpired lease
> of the debtor, the trustee may not assume such contract or lease unless,
> at the time of assumption of such contract or lease, the trustee --
>
> (A) cures, or provides adequate assurance that the trustee will
> ***promptly*** cure, such default . . . ;
>
> (B) compensates, or provides adequate assurance that the trustee will
> promptly compensate, a party other than the debtor to such contract or
> lease, for any actual pecuniary loss to such party resulting from such
> default; and

(C)  provides adequate assurance of future performance under such
contract or lease.

11 U.S.C. §365(b)(1) (emphasis added).

40.     Compliance with <u>each</u> requirement is required before assumption can be approved.
<u>See</u> <u>In re Rachels Industries, Inc.</u>, 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990) (citations omitted).
The party seeking to assume the executory contract bears the burden of proving that the contract is
one subject to assumption and that all of the requirements for assumption have been met.  <u>Id.</u>

41.     In this instance, the Debtor is required to cure the defaults under the Franchise
Agreement or provide adequate assurance that such defaults will be promptly cured. 11 U.S.C.
§365(b)(1)(A). The requirement that all existing breaches must be cured and all provisions of the
contract assumed applies both to monetary and non-monetary obligations. *In re Carterhouse, Inc.*,
94 B.R. 271, 273 (Bankr. D. Conn. 1988).

*(ii)     <u>The Debtor Cannot Cure the PIP Defaults as they are Historic and Non-curable.</u>*

42.     A contract may not be assumed if there are "incurable" breaches. <u>In re Herbert,</u> 806
F. 2d 892-895 (9th Cir.1986) (Ninth Circuit held that where debtor-franchisee failed to
continuously operate franchise, default justified termination under relevant law and was incurable;
thus, debtor could not assume franchise agreement); <u>Good Hope Refineries v. Benavides</u>, 602 F.
2d 998, 1003 (1st Cir.), <u>cert</u>. <u>denied</u>, 444 U.S. 992 (1979) ("[T]o assume an executory contract, the
trustee obtains only such contractual rights as the debtor had and assumes all burdens to which the
debtor was subject . . . If the debtor has committed, or the trustee commits, an incurable breach,
the trustee has no continuing rights under the contract."); <u>Lee West Enterprises, Inc</u>., 179 B.R.
204, 206-209 (Bankr. C.D. Cal. 1995); *In re Deppe*, 110 B.R. 898, 903-904 (Bankr. D. Minn.
1990); <u>In re Toyota of Yonkers</u>, 135 B.R. 471, 477 (Bankr. S.D.N.Y. 1992); <u>see</u> <u>also</u> <u>In re</u>
<u>Charterhouse, Inc.</u>, 94 B.R. at 273.

11

43.     Subsequent to the Bankruptcy Reform Act of 1994, courts continued to hold that the existence of an incurable default under a lease or an executory contract is a bar to assumption of said lease or executory contract due to the movant's inability to satisfy the specific statutory requirement of 11 U.S.C. §365(b)(1)(A). See e.g., In re Claremont Acquisition Corp., 113 F. 3d. 1029 (9th Cir. 1997); In re New Breed Realty Enterprises, Inc., 278 B.R. 314 (Bankr. E.D.N.Y. 2002). These courts held that 11 U.S.C. §365(b)(2)(D) did not excuse the debtor from curing non-monetary defaults, even if they are incurable. Id. See also, In re Liljeberg Enterprises, Inc., 304 F.3d 410, 444-446 (5th Cir 2002) (Fifth Circuit Court of Appeals reversed district court and found that debtor was barred from assuming pharmacy agreement pursuant 11 U.S.C. §365(b)(1)(A) due to incurable default in that agreement resulting from a default in a collateral agreement).

44.     Subsequent to the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) of 2005, with respect to executory contracts, courts continued to hold that the existence of an incurable default (other than a default related to "any penalty rate or penalty provision relating to" such default) bars assumption or assignment of the agreement.[4] See In re Empire Equities Capital Corp., 405 B.R. 687 (Bankr. S.D.N.Y. 2009) (most non-monetary defaults are not exempted from the

---

[4] Regarding executory contracts, Congress codified the statutory interpretation set forth in the line of cases of Claremont Acquisition Corp. via the BAPCPA amendments to §§365(b)(1)(A) and (B)(2)(D). In Claremont, the debtors (collectively, "Worthington") were parties to franchise agreements with General Motors Corporation ("GM"). In re Claremont Acquisition Corp., 113 F. 3d. at 1030-1031. On or about November 7, 1994, Worthington ceased operating their automobile dealerships. Id. at 1032. The bankruptcy cases were not filed until November 20, 1994. Id. at 1033. The GM Dealer Agreements allowed GM to terminate the franchise for the failure to operate the business for seven consecutive business days. Id. The Ninth Circuit court held that: "Debtors' failure to operate the dealership for two weeks preceding the bankruptcy filing constituted a nonmonetary default. Moreover, this default is a "historical fact" and, by definition, cannot be cured." Id. (citations omitted). In rendering its decision, the Ninth Circuit court ruled: "Under the interpretation we adopt today, the §365(b)(2)(D) exception does not apply to Debtors' default. Debtors' failure to operate the franchises for seven consecutive days is not a default of a contractual provision relating to the satisfaction of a penalty rate or the payment of a penalty. Accordingly, Debtors' obligation to cure their default is not excused. Because Debtors are unable to now cure their default, the GM Dealer Agreements may not be assumed and assigned." Id. at 1034-1035.

12

cure requirements of 11 U.S.C. §365(b)(2)(D). 11 U.S.C. §365(b)(1)(A) requires cure only of defaults

other than those arising from any failure to perform non-monetary obligations under an <u>unexpired

lease of real property</u>. A debtor must cure most defaults arising from an <u>executory</u> <u>contract</u> that is not

a real property lease – both monetary and non-monetary); <u>In re Eagle Creek Subdivision, LLC,</u> 397

B.R. 758 (Bankr. E.D.N.C. 2008) (**executory contract could <u>not</u> be assumed because debtor could

not cure the historical and material default of failing to complete construction by contract

deadline**); <u>In re Greenville American Limited Partnership,</u> 2000 Bankr. LEXIS (Bankr. S.C. 2008);

<u>In re Gretter Autoland, Inc.,</u> Case No. 14-02832, 2015 Bankr. LEXIS 2734, at *7 (Bankr. S.D.

Iowa Aug. 17, 2015) ("No monetary defaults exist under the franchise agreements…. Non-

monetary defaults are equally subject to the cure provisions found at [Section 365(b)(1)(A)."). [5]

---

[5] The statutory evolution of the incurable default issue was clearly analyzed by the *Empire Equities* court:

*Before the enactment of the 2005 Amendments to the Bankruptcy Code, courts disagreed on the effect of the cure requirements of §365 on non-monetary defaults. Compare <u>In re Claremont Acquisition Corp., Inc.</u>, 113 F.3d 1029, 1033 (9th Cir. 1997), followed by <u>New Breed</u>, 278 B.R. at 321 (debtor must cure all material non-monetary defaults if cure is impossible, contract cannot be assumed), with <u>Eagle Ins. Co. v. BankVest Capital Corp.</u>, 360 F.3d. 291, 296-301 (1st Cir. 2004); <u>In re Walden Ridge Dev., LLC</u> 292 B.R. 58, 66-67 (Bankr. D.N.J. 2003) (debtors are relieved from the obligation to cure non-monetary defaults altogether). This division of authority arose in part from the pre-2005 language of §365(b)(2)(D), as the statute was ambiguous as to whether it exempted from cure all non-monetary defaults or just penalty provisions triggered by non-monetary defaults. See 3 Collier on Bankruptcy P 365.05[3][c] (15th ed. Rev. 2008). In 2005 Congress revised the language of §365(b)(2)(D) by including the word "penalty" as a modifier to the word "provision", making it clear that most non-monetary defaults are not exempted from the cure requirements. 11 U.S.C. §365(b)(2)(D).*

*At the same time, Congress also gave debtors limited relief from the obligation to cure non-monetary pre-petition defaults, and it partially overruled the result in <u>Claremont</u>. Congress did so, however, not by rejecting <u>Claremont's</u> statutory reading of §365(b)(d)(D) but by adding new language in §365(b)(1)(A) that requires a cure only of defaults other than those "arising from any failure to perform non-monetary obligations under an expired lease of real property." 11 U.S.C. §365(b)(1)(A) (emphasis added). By amending §365(b)(1)(A) only with respect to unexpired leases of real property, however, Congress provided no room for the contention that non-monetary defaults in non-lease executory contracts are exempt from the cure obligation. See 3 Collier on Bankruptcy P 365.05[3][c] ("Personal property leases and nonlease executory contracts are expressly excluded."). As Congress is presumed to act with knowledge of existing judicial precedent when enacting legislation, see <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran</u>, 456 U.S. 353, 381-82, 102 S. Ct. 1825, 72 L. Ed. 2d 182 (1982), the 2005 amendments thus establish that a debtor must cure most defaults arising from an executory contract that is not a real property lease. Although the parties here have spent many pages arguing whether the Debtor's default is monetary or non-monetary, where an executory contract is involved that distinction is no longer of much relevance.*

45.     In the recent case of <u>In re Escarent Entities, L.P.</u>, 423 Fed.Appx. 462 (5th Cir. 2011) the Court was confronted with a single-asset real estate debtor that entered into a prepetition contract to sell property. The debtor filed a Chapter 11 case a week before the closing date established by the contract and then sought authority to seek better sale terms through an auction process. The debtor proposed that, if it was unable to obtain a better purchase offer, it would assume the pre-petition contract and close the sale per the assumed contract, albeit with a rescheduled closing date. The bankruptcy court approved the assumption motion over the counterparty's objection and, when no better offer materialized, ordered that the transaction be closed "after a reasonable time." In its appeal to the District Court, the counterparty argued that the contract could not be assumed because the debtor's failure to close the sale by the contractual closing date constituted a material non-monetary default that was incapable of being cured by future performance. The district court affirmed the Bankruptcy Court's order approving assumption of the purchase agreement. The Fifth Circuit reversed, finding that the debtor's failure to consummate the sale on the contractual closing date was "not only a material default, but effectively an incurable one, as the parties are unable to return to January 12, 2009, when Escarent's performance was originally due."   <u>Escarent</u>, 423 Fed.Appx. at 466.

46.     The cases cited by Debtor in the Assumption Motion are inapposite to the idea of an incurable default. While both cases did involve the completion of PIP obligations during a Chapter 11 case that is not exactly a controversial concept. There is no indication that either case involved PIP obligations that were over 2.5 years delinquent or that would be completed, if at all, more than four years after the scheduled completion date. Indeed, in the <u>Scarlet Hotels</u> case, it

---

<u>In re Empire Equities Capital Corp.</u>, 405 B.R. at 690-691.

appears that the PIP completion schedule was not even established until after the commencement

of the case. In the Nesbitt case, the only reference to PIP obligations is merely that they were to be

funded with cash collateral. The opinion offers no indication that the Debtor was in default of its

PIP obligations. This is materially different, than this case where the Debtor is in prolonged default

of its PIP obligations and projects to remain in default for at least a year and a half more.

47. The Debtor's failure to complete Property Improvement Plan ("PIP") as and when

required in the Franchise Agreement is a historic and incurable default under the Franchise

Agreement. The Debtor is therefore unable to satisfy its burden of cure under 11 U.S.C.

§365(b)(1)(A). As a result, the Franchise Agreement cannot be assumed and Hilton Franchise is

entitled to stay relief.

*(iii) The Debtor's Proposed Cure is not "Prompt" Within the Meaning of Section 365.*

48. "The period of time that is considered 'promptly' may vary in accordance with the

circumstances on a case by case basis." In re Gold Standard at Penn, Inc., 75 B.R. 669, 673

(Bankr.E.D.Pa.1987). More specifically,

> The term "promptly" under § 365(b)(1) is not defined. …. The courts have
> consistently held that a proposed cure over a period of two years or more
> was not "prompt" for purposes of § 365(b)(1). See, e.g., In re Flugel, 197
> B.R. 92, 97 (Bankr.S.D.Cal.1996) (proposed cure over 10 years not
> prompt); In re Embers 86th St., Inc., 184 B.R. 892, 901–02
> (Bankr.S.D.N.Y.1995) (29 months); In re Liggins, 145 B.R. 227
> (Bankr.E.D.Va.1992) (48–60 months); In re Lloyd, No. 92–12508S, 1992
> WL 167047 (Bankr. E.D. Pa. July 6, 1992) (3–5 years); In re Yokley, 99
> B.R. 394 (Bankr.M.D.Tenn.1989) (2 years).

Matter of DiCamillo, 206 B.R. 64, 72 (Bankr. D.N.J. 1997).

49. Here, the Debtor offers no evidence as to the promptness of its cure. The

assumption motion sets forth a loose narrative suggesting a timeline of more than 14 months,

however there are numerous implied delays (i.e., ordering and delivery of materials, approval

1600433926.3

periods, etc) and a specific reservation of the right to modify the timeline. See Assumption Motion, para 20, fn 4.

50.     In determining whether a cure is "prompt", many courts consider several factors, including a debtor's past financial performance, any inequitable conduct engaged in by the non-debtor party, and the remaining term of a lease or relationship between the parties. See In re Embers 86th Street, Inc., 184 B.R. 892, 900–901 (Bankr. S.D.N.Y 1995); In re R/P International Technologies, 57 B.R.869 (Bankr. S.D. Ohio 1985).

51.     In this case, the Debtor's past financial performance has been spotty, resulting in a pre-petition financial default of at least $130,000 and the Debtor made no effort to assume the Franchise Agreement or otherwise satisfy their PIP obligations for over two years as a Chapter 11 debtor in possession.  There is no suggestion that Hilton has acted inequitably in this matter. To the contrary, all Hilton has done is endure over two years of non-compliance with minimum brand standards while being asked to wait at least another year and a half before the Facility becomes compliant, at which time, the Debtor will have less than five years of further authorized operation as a Hampton Inn® under the Franchise Agreement.

52.     All of the factors relevant to a determination of whether cure is delivered "promptly" mitigate against the Debtor's proposed prolonged and extended period for curing the material and non-monetary defaults as to its PIP obligations. That being the case, the Assumption Motion should be denied.

*(iv) The Debtor is Obligated to Reimburse Hilton's Actual Pecuniary Loss*

53.     Although the Debtor suggests that Hilton has not suffered any actual pecuniary loss, it is mistaken. In addition to the unpaid franchise fees, Hilton is entitled to repayment of all of its costs and expenses, including reasonable attorneys' fees, plus interest. In re Entertainment, Inc., 223 B.R.

16

141, 149 (Bankr. N.D. Ill. 1998). 11 U.S.C. §365(b)(1)(B) requires the Debtor to compensate Hilton

for its "actual pecuniary loss" resulting from the defaults under the Franchise Agreement, yet the

Assumption Motion makes no provision for such payment.

54.    The non-debtor party to a lease or executory contract is entitled to attorneys' fees, as

part of the compensation for pecuniary loss, where the lease or executory contract provides for such

a remedy.  See In re Westview 74th Street Drug Corp., 59 B.R. 747, 756 (Bankr. S.D.N.Y. 1986).

Here, the Franchise Agreement contains such a provision.  See Franchise Agreement at Section 17.14.

In order to recover fees, the non-debtor party to the executory contract or lease must demonstrate that

that the losses are for actual pecuniary losses resulting from defaults under the executory contract or

lease – i.e. the attorneys' actions were taken primarily to collect sums due under the executory contract

or lease or to enforce an obligation of the debtor party to the executory contract or lease.  In re

Entertainment, Inc., 223 B.R. at 149; In re Shangra-La, Inc., 167 F.3d 843, 849 (4th Cir. 1999).  In

addition, attorneys' fees incurred to protect the lessor's interest in the context of an assumption motion

are compensable.  See LJC Corp. v. Boyle, 768 F.2d 1489, 1494-96 (D.C. Cir. 1985); In re Bullock,

17 B.R. 438, 439 (B.A.P. 9th Cir. 1982); In re BAB Enterprises, Inc., 100 B.R. 982, 984 (Bankr. W.D.

Tenn. 1989); In re Westview 74th Street Drug Corp., 59 B.R. at 752-754; In re Ribs of Greenwich

Village, Inc., 57 B.R. 319, 321 (Bankr. S.D.N.Y. 1986).

55.    Here, Hilton has incurred significant attorneys' fees and expenses in connection with

(a) the Debtor's defaults under the Franchise Agreement, (b) actions taken in connection with the

collection of sums due under the Franchise Agreement, (c) actions taken to enforce the obligations of

the Debtor, (d) actions taken in connection with the Debtor's attempts to assume the Franchise

Agreement and (e) representation of the interests of Hilton in the Debtor's bankruptcy proceeding.

Hilton will continue to incur legal fees and expenses in this matter. Hilton submits that these fees and

17

expenses are reasonable.  Hilton shall provide an affidavit, as may be requested by this Court, detailing the precise nature and amount of its legal fees and expenses.

56.     In addition, as part of its pecuniary loss, Hilton is entitled to payment of interest.  <u>See</u> <u>In re Entertainment, Inc.</u>, 223 B.R. at 150-152.  The Franchise Agreement requires the Debtor to pay Hilton interest at the lesser rate of eighteen percent (18%) per year, or the maximum rate permitted by law, accruing from the due date until the amount is paid in full.  <u>See</u> Franchise Agreement at Section 17.15

*(v) The Debtor cannot provide Adequate Assurance of Future Performance*

57.     The final prong of 11 U.S.C. §365(b)(1) requires the Debtor to provide adequate assurance of future performance under the Franchise Agreement.  <u>See</u> <u>In re Ok Kwi Lynn Candles,</u> <u>Inc.</u>, 75 B.R. 97, 102 (Bankr. N.D. Ohio 1987). The Assumption Motion does not address the viability of the Debtor's future performance at all, let alone adduce any evidence that would constitute adequate assurance of future performance in compliance with the requirements of Section 365 (b)(1).  As such, the Debtor cannot establish compliance with Section 365 (b)(1) and the Assumption Motion must be denied.

58.     To the extent the Debtor seeks to rely on the previously filed Plan and Disclosure Statement as a basis for adequate assurances, it must fail. First, the Plan and Disclosure Statement have been or will be withdrawn in favor of amended versions and the Debtor has clearly indicated that it will not be pursuing its reorganization via those pleadings. Moreover, even if those pleadings are still of record, they are insufficient. There are no cost estimates for the Hilton PIP. The financial projections do not account for any expenditure in connection with the PIP and show minimal disposable revenue after payment of the secured creditor. Additionally, the new equity contribution of up to $1,000,000 has to pay approximately $200,000 to pay/cure monetary defaults  and must

18

also fund the capital improvement needs for three different hotels. There is no indication how much the PIP will cost this Debtor and no indication as to how much this Debtor will have available to pay the PIP. In short, there are no facts upon which the Court can base a determination of adequate assurance of future performance. See In re Memphis-Friday's Assoc., 88 B.R. 830 (Bankr. W.D. Tenn. 1988) (franchisee-debtor did not provide adequate assurance of future performance with regard to assumption of agreement to run a franchised restaurant as it offered only generalities that were unsupported by records or objective fact).

**B.    The Assumption Motion does not Satisfy the Business Judgment Standard.**

59.    The Assumption Motion does not clear the business judgment hurdle. Bankruptcy courts use the business judgment standard to determine whether to approve rejection, assumption or assignment or an executory contract. *In re G.I. Indus.,* 204 F.3d 1276 (9th Cir. 2000); *In re Klein Sleep Prods.,* 78 F.3d 18 (2d Cir. 1996); *Richmond Leasing Co. v. Capital Bank. N.A.*, 762 F.2d 1303 (5th Cir. 1985).

60.    In general, the business judgment standard requires a sufficient showing from the Debtor that: (1) performance of the contract will be advantageous to the estate; and (2) the estate will be able to perform under the contract. *In re Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990). *See also In re HQ Global Holdings, Inc.*, 290 B.R. 507(Bankr. D. Del. 2003); *In re Surfside Resort and Suites, Inc.*, 325 B.R. 465 (Bankr. M.D. Fla. 2005).

61.    "[T]he threshold requirement and burden of the trustee is to produce credible evidence that his decision to assume or reject would benefit the estate or result in a successful reorganization. "Where the debtor or trustee has failed to produce any credible evidence that assumption or rejection would benefit the estate or result in a successful reorganization, the courts have declined to approve the requested assumption or rejection. *See In re Sun City Investments,*

19

*Inc.*, 89 B.R. 245, 248-49 (Bankr. M.D. Fla. 1988).

62.     Here, the Debtor has not presented any evidence or analysis of the alleged benefit to the estate from the proposed assumption. There is absolutely no evidence proffered by the Debtor to reflect that assumption will increase revenue over non-assumption. Moreover, even if there were evidence that revenue would be higher in an assumption scenario, there is no evidence that such increase was of a magnitude sufficient to outweigh the costs of assumption, *i.e.*, the cost to cure all monetary and non-monetary defaults. Indeed, such a showing is impossible here as there is no indication as to the cost to cure the non-monetary defaults. Moreover, as a further obstacle, any "profit" on increased revenue would have to be fully realized in approximately six years or less because that is when the Franchise Agreement expires and the Debtor has no rights to extend that term or otherwise renew the Franchise Agreement. Thus, the Debtor is asking for authority to spend a fair sum of money to assume and agreement for about 6 years, only to then have to de-identify the Facility and separate from the Hilton system – all without any showing that this process will benefit the estate in any way.

## III.    CONCLUSION

63.     Hilliard's right to operate the Facility as a Hampton Inn by Hilton® branded property is conditioned on its compliance with the provisions of the Franchise Agreement, which include not only its payment obligations, but also its continuous compliance with Hampton Inn brand standards which are designed to create a cohesive and uniform experience for guests across the system portfolio. The failure of a system unit to maintain brand standards has a negative impact on the entire brand and the public's perception thereof.

64.     In this case, Hilliard has failed to comply with brand standards by failing fully and timely to complete the mandatory repairs and improvements to the Facility as required under the

Franchise Agreement. The Debtor has been delinquent in the completion of its contractual repairs and improvement obligations for almost two and a half years and, under its assumption proposal, will persist in this noncompliance for at least another year and a half.

65.    The Debtor has been operating outside of required brand standards for a prolonged period of time, to the detriment of the Hampton Inn by Hilton® brand. The Debtor has availed itself of the benefits of the Hampton Inn by Hilton® brand while defaulting on its obligations under the Franchise Agreement for a prolonged period of time. Hilton bargained for a compliant Facility and, through no fault of its own, will be deprived of that bargain for a minimum of 4 years. That deprivation cannot be undone. That deprivation cannot be cured

For the foregoing reasons, Hilton respectfully requests the entry of an Order denying the Debtor's Motion to Assume the Franchise Agreement and granting Hilton's Stay Relief Motion, and granting Hilton such other and further relief as the Court deems just and proper.

Dated: July 9, 2025

<div style="margin-left: 40%;">

Respectfully submitted,

**K&L GATES LLP**

*/s/ David S. Catuogno*
Daniel M. Eliades (admitted *pro hac vice*)
David S. Catuogno (admitted *pro hac vice*)
One Newark Center, 10th Floor
1085 Raymond Boulevard
Newark, New Jersey 07102
Tel: 973-848-4018
Email: daniel.eliades@klgates.com
Email: david.catuogno@klgates.com

</div>

21

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on July 9, 2025, a true and correct copy of the foregoing Motion

and Notice were served via the Court's electronic case filing system on all ECF participants registered

in this case at the email address registered with the court and by ordinary U.S. Mail on the following:

Denis E Blasius
Darlene E. Fierle
Ira H. Thomsen
140 N Main Street
Springboro, OH 4506
*(Debtor's Attorney)*

Welcome Group 2, LLC
Dayton Hotels, LLC
Hilliard Hotels, LLC
5955 E. Dublin Granville Road
New Albany, OH 43054
*(Debtor)*

U.S. Trustee
Asst US Trustee (Col)
Office of the US Trustee
170 North High Street
Suite 200
Columbus, OH 43215
*(U.S. Trustee)*

Pamela Arndt
DOJ-Ust
170 North High Street
Suite 200
Columbus, OH 43215
*(Attorney for U.S. Trustee)*

Tami Hart Kirby, Esq.
Porter Wright Morris & Arthur LLP
One South Main Street, Suite 1600
Dayton, OH 45402-2028
*(Attorney for RSS WFCM2019-C50-OH WG2, LLC)*

Noah M. Schottenstein, Esquire
DLA Piper LLP (US)
1900 North Pearl Street, Suite 2200
Dallas, TX 75201
*(Attorney for Itria Ventures LLC)*

C. Kevin Kobbe, Esquire
DLA Piper LLP (US)
650 South Exeter Street, Suite 1100
Baltimore, MD 21202
*(Attorney for Itria Ventures LLC)*

David Alan Beck
Carpenter Lipps LLP
280 North High Street, Suite 1300
Columbus, OH 43215

Walter Reynolds, Esq.
1 S. Main Street, Suite 1600
Dayton, OH 45402

A Lawncare
3970 New Riley Road
Dresden, OH 43821

A.C.E.
7715 Northwest 22nd
Avenue - 312
Miami, FL 33147

AEP OH
P.O. Box 371496
Pittsburgh, PA 15250-7496

AES Ohio
P.O. Box 2631
Dayton, OH 45401-2631

Best Western International, Inc.
P.O. Box 842700
Los Angeles, CA 90084-5080

1600433926.3

Charter Communications
P.O. Box 6030
Carol Stream, IL 60197-6030
City of Sidney
201 W. Poplar Street
Sidney, OH 45365

City of Sidney
201 W. Poplar Street
Sidney, OH 45365

City of Sidney - Utility
201 W. Poplar Street
Sidney, OH 45365-2720

Columbia Gas of Ohio, Inc.
290 W. Nationwide Blvd, Unit 114
Columbus, OH 43215

DeBra Kuempel
P.O. Box 701620
Cincinnati, OH 45270

DirectTV
P.O. Box 5006
Carol Stream, IL 60197-5006

Direct Tv
2260 E. Imperial Hwy.
El Segundo, CA 90245

Donnellon McCarthy
10855 Medallion Drive
Cincinnati, OH 45241

Epro Services
1491 Polaris Parkway, #217
Columbus, OH 43240

Expedia
P.O. Box 844120
Dallas, TX 75284-4120

1600433926.3

Gordon Food Services, Inc.
P.O. Box 88029
Chicago, IL 60680-1029
Hilton
755 Crossover Lane
Memphis, TN 38117

IGEL
2040 Alum Creek Drive
Columbus, OH 43207

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

Itria Ventures, LLC
1 Penn Plaza, Suite 3101
New York, NY 10119

Mailender
P.O. Box 23158
New York, NY 10087-3158

Mega City Fire & Security
8210 Expansion Way
Dayton, OH 45424

Miracle Method of Columbus
1575 Integrity Drive E
Columbus, OH 43209

Montgomery County Board of Comm.
451 W Third St.
Dayton, OH 45422

Montgomery County Convention Fac
22 E. 5th Street
Dayton, OH 45402

Montgomery County Environmental
1850 Spaulding Rd.
Kettering, OH 45432

Muskingum County Board of Commissioners
401 Main Street
Zanesville, OH 43701

1600433926.3

Muskingum County Convention
Attn: Downtown CSR
113 N. 5th St.
 Zanesville, OH 43701

Muskingum County Utilities
375 Richards Rd.
Zanesville, OH 43701

Ohio Bureau Of Workers' Compensation
30 W. Spring St.,
Columbus, OH 43215-2256

Ohio Department of Taxation
Attn: Bankruptcy Division
PO Box 530
Columbus, OH 43216

Ohio Department of Taxation
C/O Bankruptcy Division
30 East Broad Street, 21st Floor
Columbus, OH 43215

The Ohio Painting Company
3040 S. Tech Blvd.
Miamisburg, OH 45342

Onity, Inc.
4001 Fairview
Industrial Drive SE
Salem, OR 97302

Otis Elevator
321 S. Main Street
Dayton, OH 45402

Servicemaster
1524 E. 2nd Street
Dayton, OH 45403

Site Search, LLC
55 Buttercup Court
Marco Island, Fl 34145
Super 8 Worldwide Inc.,
22 Sylvan Way
Parsippany, NJ 07054

1600433926.3

Sysco - Cincinnati
10510 Evendale Drive
Cincinnati, OH 45241

U.S. Small Business Administration
200 W. Santa
Boulevard, Suite 740
Santa Ana, CA 92701

Washington Township Trustees
8200 Mcewen Road
Dayton, OH 45458

Wilson Memorial Hospital
915 West Michigan Street
Sidney, OH 45365

Hillside Maintenance Company
PO Box 133
Greensburg, IN 47240

RSS WFCM2019-C50-OH WG2, LLC
200 South Biscayne Blvd.
Suite 3550
Miami, FL 33131

Shelby County Treasurer
Shelby County Annex
Floor 3
Sidney, OH 45365

U.S. Foods Inc.
98761 Collections Center Drive
Chicago, IL 60693

*/s/ David S. Catuogno*
David S. Catuogno

27